IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| REBECCA L. KENDALL, § | |
| § | |
| Plaintiff, § | |
| § | CIVIL ACTION NO. |
| v. § | 1:12-CV-00847-LY |
| § | |
| WALGREEN CO., § | |
| JOHANNA VITERI and § | |
| JAMES MEAD, § | |
| § | |
| Defendants. § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiff Rebecca Kendall, and hereby files her response in opposition to Defendant's Motion for Summary Judgment (Dkt. 29), and in support of such opposition would respectfully show as follows:

**I.  STATEMENT OF FACTS**

Plaintiff concurs with Section A of Defendant's Statement of Facts in Dkt. 29. Kendall submits the following additional or contested facts.

Rebecca Kendall had worked for Walgreens since about 2001. She was first hired as an assistant manager, and then in around 2006, was promoted to a store manager position. Exh. A, 13:23-15:5. During the period relevant to this lawsuit, Kendall was the store manager for the Walgreens store on Gattis School Road in Round Rock. Exh. A, 15:14-19.  As also described by Defendant, in April 2011, Kendall was involved in a

verbal altercation with Kendall's community supervisor, Jim Mead. Exh. A, 48:13-49:10. The entire incident was witnessed by employee Shana Yoder. Exh. A, 53:18-54:22.

That evening, or the following day, Kendall spoke to Loss Prevention Officer Rick Gaitan about the incident. Exh. A, 70:7-10. Gaitan was apologetic, and directed Kendall to obtain a statement from any witnesses. Exh. A, 52:1-24. Kendall subsequently instructed Yoder to prepare a witness statement, per Gaitan's instructions. Exh. A, 53:18-25. Yoder did so. *Id.*

Kendall had been seeing psychologist Cari Kahn, Ph.D, since April 2010. Exh. C, 69:7. Walgreens was Kendall's primary topic of discussion in these sessions. Exh. C, 70:24-71:5. Kahn diagnosed Kendall with dysthymic disorder, which is a form of depression. Exh. C, 74:23-75:7. With the consultation of Dr. Kahn, Kendall applied for medical leave. Exh. A, 98:25-100:10. Walgreens approved Kendall for 12 weeks of FMLA leave. Defendant's Motion for Summary Judgment, Dkt. 29, p. 5.

In May 2011, Johanna Viteri, a Florida store manager was promoted to the District Manager position at Kendall's district, thus becoming Kendall and Mead's new supervisor. Viteri had just received a promotion to District Manager, taking on that role for the first time. Exh. D, 8:19-25. Kendall therefore sent her new district manager, Viteri, an email regarding the medical leave. Exh. A, 100:11-14. Viteri responded with a phone call to Kendall. Exh. A, 100:21-23. Viteri was irate and aggressive on the phone. Exh. A, 245:1-14. Viteri asked Kendall inappropriate questions, such as "what's wrong with you?", with respect to Kendall's medical condition. Exh. A, 247:14-248:2. After Viteri asked Kendall if she would still go on leave if Viteri refused to pay her, Kendall was afraid and felt like Viteri might fire her. Exh. A, 246:20-247:3. Nevertheless,

Walgreens' third-party leave benefits management company, Sedgwick, reaffirmed that Viteri did not have a say in whether Kendall could go on leave. Exh. A, 247:9-13. The phone conversation between Kendall and Viteri was the first private conversation that they had had. Exh. A, 244:9-245:2.

While on leave, an employee named Matt Sullins texted Kendall a photo of her workspace. Exh. A, 112:3-114:22. It showed that Walgreens had removed all of her personal belongings, despite the fact that she would be returning to her job. *Id.* Furthermore, only a week into Kendall's medical leave, Jim Mead told another Walgreens manager, by email, that he did not know "when/if" Kendall was returning. Exh. A, 149:24-151:25. Walgreens also removed Kendall as the store's manager on the Walgreen's home site information page. Exh. A, 130:13-20.

When it was time for Kendall to be reinstated following the completion of the FMLA leave, she was instructed to first report to the district office on October 5, 2011. Exh. A, 156:22-157:13. She was detained at the office for a couple of hours. Exh. A, 158:10-17. Viteri made the decision to terminate Kendall at that time. Exh. D, 66:4-5. Viteri alleged that Kendall was being terminated for poor performance, documented instances of poor judgment and for interfering with an investigation. Exh. A, 72:5-74:16.

## II. SUMMARY OF ARGUMENT

Plaintiff Kendall concedes and waives her claims under Title VII of the Civil Rights Act of 1964 and her claim of actual disability discrimination under the Americans With Disabilities Act and its Amendments, and therefore does not address them in response. However, Kendall continues to assert her claims of "perceived disability" discrimination under the ADAAA as well as the retaliation and interference claims under

the Family & Medical Leave Act of 1993. It is as to those remaining claims that Kendall offers her opposition to summary judgment.[1] In so responding, Kendall presents more than a scintilla of evidence that (1) Walgreens retaliated against her due to taking FMLA leave, (2) Walgreens interfered with her right to reinstatement under the FMLA, and (3) Walgreens discriminated against her due to a *perceived* mental disability.

### III.  STANDARD OF REVIEW

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986).

### IV.  SUMMARY JUDGMENT EVIDENCE

Exh. A – Excerpt from deposition of Rebecca Kendall

Exh. B – Excerpt from deposition of Shana Yoder

Exh. C – Excerpt from deposition of Cari Kahn, Ph.D

Exh. D – Excerpt from deposition of Johanna Viteri

Exh. E – *Ion v. Chevron USA, Inc.,* 731 F.3d 379 (5th Cir. – September 26, 2013)

---

[1] While Defendant did not specifically address Plaintiff's "perceived disability" claim (see Plaintiff's Original Complaint, Dkt. 1, ¶29) in its Motion for Summary Judgment, Plaintiff will address the issue in its entirety out of an abundance of caution.

Exh. F – Photograph of Kendall's office area during period of leave

Exh. G – Email from Jim Mead to Walgreens manager, July 13, 2011

Exh. H – Excerpts from deposition of James Mead

Exh. I – Written witness statement by Shana Yoder

Exh. J - *Burke v. Laboratory Corp. of America*, No. 8:08-CV-2072-T-24-TGW, 2009 U.S. Dist. LEXIS 92891 (M.D. Fla. Oct. 6, 2009)

## V. OBJECTIONS TO DEFENDANT'S SUMMARY JUDGMENT EVIDENCE

1.   Plaintiff objects to Defendant's Exh. 8 (Dkt. 29-8), ¶¶ 6, 8, 9 and 13, Declaration of Kerri Kaufmann, as to Kaufmann's testimony regarding statements that were allegedly told to her by Loss Prevention Officer Rick Gaitan.  Those statements are hearsay.

## VI. ARGUMENT AND AUTHORITIES

### A. FMLA RETALIATION

**Kendall can show more than a scintilla of evidence that she was terminated for a reason other than a legitimate, non-discriminatory reason, where such evidence suggests that Kendall was the victim of retaliation for taking FMLA leave.**

Under the first step of the mixed-motive burden-shifting framework of *McDonnell Douglas*, Kendall must establish a prima facie case of FMLA retaliation.  See *Hagan v. Echostar Satellite, L.L.C.,* 529 F.3d 617, 624 (5th Cir. 2008).  To do so, she must show that (1) she was protected under the FMLA, (2) she suffered an adverse employment action, and (3) the adverse action was taken because she sought protection under the FMLA.  *Maunder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006) (citation omitted).  Walgreens appears to agree that Kendall was protected by the FMLA and does not dispute that her termination was an adverse employment action. See Defendant's Motion for Summary Judgment, Dkt. 29, p. 5. Walgreens does appear to

contend Kendall was not terminated because she sought protection under the FMLA. However, certain evidence suggests otherwise.

**Kendall-Viteri phone conversation**

The phone call during which Kendall and Viteri discuss Kendall's upcoming FMLA leave was only the second conversation between the two, with the first being a brief conversation during a meet-and-greet with other Walgreens managers.  Exh. A, 244:9-23.  Despite having virtually no relationship with Kendall, Viteri was hostile toward Kendall about her FMLA.  Kendall describes the conversation as follows:

```
25      A.   It wasn't a pleasant one.   It was --
 1   when I picked up the phone and said hello and she
 2   was like, this is Ms. Viteri.  I was like, oh,
 3   thank you for returning my call, I just spoke with
 4   Sedgwick and my doctor and I am going to need to be
 5   taking a leave of absence.  And I was explaining
 6   that to her when she raised her voice at me and
 7   started saying repeatedly, who is your boss, who is
 8   your boss, who is your boss.  And I was like, you
 9   are.  And she was like, so who do you think you
10   need to tell?  I'm like, I'm telling you.
11           And she was like -- I think she went on
12   to say something like, well, what if I don't pay
13   you, are you still going to go on leave?  And I was
14   kind of quiet for a little bit.  And then I said,
15   well, yes, I need to go on leave even if you don't
16   pay me.
17           And then she went into -- she was
18   frustrated with me and she started saying, what's
19   your problem Rebecca, what's wrong with you, why
20   can't you work, and asking me all these personal
21   questions.  And I was upset so I just started
22   answering her when I probably shouldn't have.
23      Q.   And what did you tell her?
24      A.   I just said that I didn't feel like I
25   was functioning good -- well enough to run the
 1   pharmacy and be back there filling people's
 2   prescriptions and giving direction to everyone
 3   because I was in a very bad state and I needed time
 4   off until I get it together.
```

Exh. A, 100:25-102:4 (emphasis added). Kendall describes Viteri's tone as "aggressive" and "irate", and it made Kendall feel pressure, as if Viteri was going to fire her. Exh. A, 246:6-247:3. This conversation suggests that Viteri had clear animosity toward Kendall because of the FMLA leave, at one point essentially trying to use withholding Kendall's pay to keep her from taking the leave. Interestingly, Viteri claims to not remember any of the specifics of the conversation. Exh. D, 30:15-24.

In a very recent Fifth Circuit decision on point, the Court considered the following email between a General Manager and the employee/plaintiff's supervisor:

> "It looks like [the employee] is playing games with us after his suspension. I assume the "paperwork for short-term disability" comment meant that he is looking for a doctor to give him some FMLA-qualified time off. What are our options moving forward?"

*Ion v. Chevron USA, Inc.*, 731 F.3d 379, *12 (5th Cir. – September 26, 2013). Exh. E. The Fifth Circuit found that this email, alone, "serves as evidence that [the General Manager] was upset that [the employee] was seeking FMLA-qualified time off." *Id.* at *29-30. The Court concluded that this email, alone, was sufficient to create a genuine issue of fact as to whether the employee's FMLA-protected leave was a motivating factor in the company's decision to terminate him. *Id.* Viewing Kendall's testimony in a light most favorable to her, the substance of the phone conversation with Viteri should also serve as sufficient evidence to demonstrate Viteri's animus toward Kendall's FMLA leave.

**Removing Kendall's Property and Identity**

While Kendall was on leave, an employee at her store, Matt Sullins, sent her a photo by text message of her office. Sullins sent it because it made him wonder whether

Kendall was coming back.  Exh. A, 113:11-19.[2]  All of Kendall's personal belongings, including her photographs on the wall, bookshelves and desk, as well as her plaques and certificates, had been removed without explanation and without her permission.  112:3-113:5; Exh. F.  Furthermore:

> They threw away all my -- they threw away a lot of my personal belongings and all my files with all my notes that I have kept for years. Just, they cleaned out my manager box, which is the very top one, which I had all my stuff in it that I needed.  Maribel Thompson threw everything away.  My jacket that was in there, they threw it away.  I had ultrasound pictures from my first grandchild, they threw that away.  Some artwork that my son had presented me with, they threw it away.  I mean, just all my personal belongings.  I had been there several years.

Exh. A, 113:24-114:11.  After Kendall complained, some of her personal items were returned to the desk.  Exh. A, 121:22-122:4. The fact is that the top of the desk is not normally used during the inventory process.  Exh. B, 21:4-9.  In addition to this, Kendall was removed as the store manager on the company's home site information page.

**James Mead email**

James Mead claimed in his deposition that he believed Kendall was going to return from leave at some point.  However, in an email dated July 13, 2011 (only a week after Kendall went on leave), Mead told another Walgreens employee, about Kendall: "We are unsure if/when she will be back to work."  Exh. G.  Despite being asked, he could provide no explanation as to why he put "if" in that statement.  Exh. H, 63:5-63:25.  Although Mead may not have made the decision to terminate Kendall, he was the community supervisor for this store.  A reasonable juror could infer that Mead and his and Kendall's supervisor, Viteri, had discussed Kendall's future at some point in time before or during Kendall's leave.   Putting all of this evidence in a light most favorable to

---

[2] Plaintiff's counsel objected to Defendant counsel's deposition question that elicited this testimony about Sullins' intent. Plaintiff withdraws that objection.

*Plaintiff's Response to Defendant's Motion for Summary Judgment*     8

Kendall, a reasonable juror could find that Viteri, and therefore Walgreens, had animus toward Kendall due to her FMLA leave. Furthermore, the Fifth Circuit has stated "when dealing with employment discrimination cases, which usually necessarily involves examining motive and intent…granting of summary judgment is especially questionable." *Hayden v. First Nat. Bank*, 595 F.2d 994, 997 (5th Cir. 1979). Kendall asks that this Court apply the same reasonable hesitation in this case.

## ALLEGED LEGITIMATE, NON-DISCRIMINATORY REASON

Walgreens contends that Kendall was terminated for a non-discriminatory reason having to do with a Loss Prevention investigation into an incident between her and James Mead. However a "plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). There is certain evidence that, when viewed in a light most favorable to Kendall, suggests Walgreens' proffered reason is false:

### Kendall Following the Loss Prevention Officer's Instructions

Kendall was specifically instructed by the Loss Prevention Officer, Rick Gaitan, that Kendall "should definitely take statements of whoever witnessed the account." Exh. A, 52:10-24. Kendall, as a store manager, is required to cooperate with the Loss Prevention Officer and follow his instructions. Exh. D, 70:6-12. Should the Court sustain Plaintiff's objection to hearsay statements from Gaitan in Defendant's Exhibit 8 (Dkt 29-8), there is no summary judgment evidence contradicting Kendall's assertion in this regard. However, even if the objection is overruled, there is a fact issue on whether

Kendall actually did anything improper or was only following instructions as required by Walgreens.

As instructed, Kendall obtained a statement from the only witness, Shana Yoder, and placed it in Ms. Yoder's file.  Exh. A, 52:16-22.  Walgreens claims that Kendall "pressured a subordinate…to give a statement favorable to Kendall"; however, Yoder felt pressure "because of the whole situation in general", and stated that Kendall "kept telling [Yoder] to tell the truth."  Those instructions – "tell the truth" were the same instructions given to Yoder by another Loss Prevention Officer.  Exh. I.

**Alleged Poor Performance not a Termination Factor**

Although Walgreens claims that the decision to terminate Kendall was also made in consideration of "a history of poor performance", nothing in the record suggests that Kendall was already going to be terminated for performance either before her FMLA leave or upon her return.  See Defendant's Motion for Summary Judgment, Dkt. 29, p. 9.  Viteri testified that Kendall did not exhibit any instances of poor performance or poor judgment while on FMLA leave.  Exh. D, 73:8-20.

With regard to retaliation claims, the Fifth Circuit has ruled that "[c]lose timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *Dooley v. Parks and Recreation for Parish of East Baton Rouge,* 433 Fed.Appx. 321, 324 (5th Cir. 2011), *citing Swanson v. Gen. Servs. Admin.,* 110 F.3d 1180, 1188 (5th Cir. 1997).  While Kendall was not terminated until approximately three months after the hostile conversation with Viteri, Viteri intentionally chose not to contact Kendall while she was on FMLA leave. Exh. D, 62:3-6.  Under these circumstances, Plaintiff contends that this

Court should disregard the three-month gap created by Kendall's leave because it is essentially an artificial buffer of time. Furthermore, in *Evans v. City of Houston,* 246 F.3d 344, 354 (5th Cir. 2001), a time lapse of up to four months was sufficient to satisfy the causal connection for prima facie case of retaliation. (Temporal proximity, however, is not required in order to establish the causal connection. See *Gee v. Principi*, 289 F.3d 342, 347 (5th Cir. 2002).) Temporal proximity here does provide further summary judgment evidence of retaliatory intent.

B.  FMLA INTERFERENCE

**Walgreens interfered with Kendall's right to reinstatement under the FMLA following the exhaustion of her FMLA leave.**

To prevail on an interference claim, a plaintiff "must show 'that (1) she is an eligible employee under the FMLA, (2) the defendant is an employer subject to the requirements of the FMLA, (3) she was entitled to FMLA leave, (4) she gave notice to the defendant of her intention to take FMLA leave, and (5) the defendant denied her the benefits to which, under the FMLA, she was entitled.'" *Ford-Evans v. Smith*, No. 04-3344, 2007 U.S. Dist. LEXIS 44627, 2007 WL 1795717 (S.D. Tex. June 19, 2007) (citing *Schimek v. MCI, Inc.,* No. 05-0045, 2006 U.S. Dist. LEXIS 54747, *35 (N.D. Tex. Aug. 7, 2006)). Pursuant to 29 C.F.R. § 825.214, the general rule is that on return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. Kendall's return from employment involved nothing but a termination meeting, which cannot be considered "reinstatement". Although that seems common sense considering the regulation's description of what constitutes "reinstatement", one court had to make a determination that an employee who,

after FMLA, returned to work for three minutes before being terminated was not "reinstated" before the termination. See *Burke v. Laboratory Corp. of America*, No. 8:08-CV-2072-T-24-TGW, 2009 U.S. Dist. LEXIS 92891 (M.D. Fla. Oct. 6, 2009). Exh. J. Here, Walgreens argues that it did not interfere with Kendall's FMLA leave because she was provided the full 12 weeks of leave. However, they disregarded her right to reinstatement in making that argument.

To the extent that Walgreens argues that it still had a right to interfere with Kendall's right to reinstatement based on an alleged legitimate, non-discriminatory reason for termination, the same rebuttal to that argument provided by Kendall in Section A, above, would apply here as well.

## C. "PERCEIVED" DISABILITY DISCRIMINATION

**More than a scintilla of evidence demonstrates that Viteri, and therefore Walgreens, believed Kendall had a mental disability that made her unfit to continue as an employee.**

Plaintiff would first note that Defendant did not request summary judgment on Plaintiff's claim of perceived disability, which she alleged in Paragraph 29 of her Original Complaint (Dkt. 1). However, out of an abundance of caution, and because some of the elements overlap with a standard disability discrimination claim, Plaintiff will address her perceived disability claim in its entirety.

To succeed on an ADA claim, the plaintiff must show that (1) he has a disability; (2) he is qualified for the position; and (3) he suffered an adverse employment action based on his disability. *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1092 (5th Cir. 1996) (citing *Rizzo v. Children's World Learning Ctrs., Inc.*, 84 F.3d 758, 763 (5th Cir. 1996)). The plaintiff's disability, or perceived disability, need only be a "motivating

factor" for the discriminatory action. See *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008). Under the ADA, discrimination need not be the sole reason for the adverse employment decision, but must actually play a role in the employer's decision making process and have a determinative influence on the outcome. *Id.*

The ADA defines "disability" as (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being <u>regarded as</u> having such an impairment. 42 U.S.C. § 12102(1) (emphasis added). An employee falls under the "regarded as" definition if he "establishes that he . . . has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A) (emphasis added). A party is "regarded as having such an impairment" if the party can show that the party's employer "entertain[ed] misperceptions about the individual - it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not limiting." *Kemp v. Holder*, 610 F.3d 231, 237 (5th Cir. 2010). Further, he is not required to show "how or to what degree [his employer] believed the impairment affected him." *Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012). Therefore, Kendall can defeat summary judgment by showing more than a scintilla of evidence that she was regarded by Viteri as having a disability.

Kendall would again point directly to the hostile response from Viteri, who repeatedly asked "what's wrong with you?" and "why can't you work", in a raised tone of voice and from Kendall's perspective, a clearly frustrated of voice. Upon being

confronted by personal questions from a hostile boss, Kendall had to essentially tell her that she was not mentally well. This was in the context of a conversation about Kendall taking medical leave for a medical condition. Kendall testified that she found Viteri's tone to be "irate", "visibly upset", "aggressive" and "disrespectful", to the point where it made Kendall feel "bad." Exh. A, 245:3-19. Viteri's words and tone do not suggest that she believes Kendall had a valid medical condition, despite the fact that Kendall was diagnosed by her psychologist with depression. Exh. C, 38:22-25. While that entire telephone conversation goes toward establishing an animus toward Kendall's FMLA leave, these specific questions demonstrate Viteri's animus toward Kendall's mental health and frustration that Kendall appeared to be unable to work. Because Viteri and Kendall only spoke 2 or 3 times before Kendall's leave, that fact makes this telephone call even more significant. It was one of the only conversations that the two had before Viteri (who made the termination decision) decided to terminate her. A reasonable jury could conclude, based on Viteri's hostility toward Kendall, that Viteri's apparent belief that there was something mentally "wrong" with Kendall was a motivating factor to get rid of her.

## **CONCLUSION AND PRAYER**

Kendall has met her burden of bringing forth more than a scintilla of evidence to defeat summary judgment as to Kendall's claims of perceived disability discrimination under the ADAAA, retaliation under the FMLA and interference with Kendall's rights under the FMLA. Having made the minimal showing required under the law, Plaintiff Kendall respectfully requests that the Court deny these portions of Defendant Walgreens' Motion for Summary Judgment.

        Respectfully submitted,

        /s/ Kerry V. O'Brien

        KERRY V. O'BRIEN
        Texas Bar No. 24038469

        O'BRIEN LAW FIRM PC
        1011 Westlake Drive
        Austin, Texas 78746
        ko@obrienlawpc.com
        ph (512) 410-1960
        fx (512) 410-6171

        Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that the above document was served on the following via the CMECF electronic filing system to all registered users on November 13, 2013, including:

Elizabeth Chestney
Counsel for Defendant Walgreens

        /s/ Kerry V. O'Brien
        Kerry V. O'Brien